547 F.2d 380
 UNITED STATES of America, Plaintiff-Appellee,
v.
William BRITZMAN and Arthur Rubin, Defendants-Appellants.
 Nos. 76-1548, 76-1559.
 United States Court of Appeals,
Seventh Circuit.
 Decided Jan. 7, 1977.
Argued Dec. 6, 1976.
 
 Arthur J. O'Donnell, Lawrence J. Suffredin, Jr., Chicago, Ill., for defendants-appellants.
 Samuel K. Skinner, U. S. Atty., J. Daniel Stewart, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.
 Before SWYGERT, PELL and BAUER, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 The defendants in this case were convicted of mail fraud in connection with a check-kiting scheme. They contend that their convictions must be vacated because the use of the mails was unrelated to the execution of the scheme. We agree, and reverse the district court's denial of the defendants' motion for acquittal.
 
 
 2
 * Defendants William Britzman and Arthur J. Rubin were indicted on eight counts of mail fraud under 18 U.S.C. § 1341[1] because they allegedly utilized the mails in conducting a check-kiting scheme between September 28, 1974 and December 30, 1974. The indictment charged that the scheme revolved around two checking accounts, one opened by Rubin at the Dempster Plaza State Bank in DesPlaines, Illinois, in the name of "A & R Cards & Forms" and the other opened by Britzman at the Citizens Bank and Trust of Park Ridge, Illinois in the name of "Forms & Procedures."
 
 
 3
 The theory behind the alleged scheme was that each man would draw checks on the account he had established payable to the business name used by the other man. They would then exchange checks and deposit them on the same day in their respective business accounts. Because the checks would take a certain amount of time to clear, the defendants would have the use of the money deposited during that time period even if the accounts on which the checks were drawn lacked sufficient funds to cover them. In addition, the indictment stated, Rubin began withdrawing cash from the A&R account and covering the shortage by promptly exchanging another pair of checks with Britzman. Once Rubin began withdrawing cash, it was necessary for the defendants to continually exchange checks in order to avoid having the banks detect the fraud.[2]
 
 
 4
 The indictment further alleged that the defendants used three bank statements mailed to Britzman and two bank statements and three overdraft notices mailed to Rubin[3] in furtherance of their scheme.
 
 
 5
 Britzman and Rubin were both convicted by a jury of all eight counts of mail fraud. During the trial, the judge indicated that although the evidence of fraud against the defendants was very strong, he had grave doubts as to whether there was a connection between their fraudulent conduct and the use of mails. However, he permitted the question of whether the use of mails was in furtherance of the fraudulent scheme to go to the jury. At sentencing, the judge stated;
 
 
 6
 I am still distressed with what I conceive to be a misuse of the mail fraud statute as represented by these state cases which are brought under the mail fraud statute even though there is no really material use of the mails.
 
 
 7
 I think given the present status of the 7th Circuit's decisions, I cannot grant the motion for judgment of acquittal. If I were on the court of appeals I would reverse the conviction. . . . and if I were on the Supreme Court I would do the same.
 
 
 8
 The defendants now appeal their convictions on a number of grounds. Because we find that the mailings were unconnected with the execution of the check- kiting scheme, we do not reach the defendants' other contentions.
 
 II
 
 9
 The starting point for analysis in this case is the Supreme Court's decision in United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). In discussing the connection that must exist between a fraudulent scheme and the use of the mails to support a conviction under 18 U.S.C. § 1341, the Court stated that while it is unnecessary that the scheme contemplate the use of the mails as an essential element, "the mailing must be 'for the purpose of executing the scheme, as the statute requires.' " 414 U.S. at 400, 94 S.Ct. at 648, citing Kann v. United States, 323 U.S. 88, 94, 65 S.Ct. 148, 89 L.Ed. 88 (1944). The Court noted that "Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this." 414 U.S. at 405, 94 S.Ct. at 651 (footnote omitted). Accordingly, we can sustain the defendants' convictions only if at least one of the eight mailings at issue aided the execution of their check-kiting scheme.
 
 
 10
 The Government contends that the five bank statements and three overdraft notices aided the defendants because the statements and overdraft notices permitted them to ascertain whether the time lag between the dates on which they exchanged checks was of the correct duration and to adjust the mechanics of their scheme upon learning that the time period between exchanges they were using was resulting in overdrafts in one of the accounts. Specifically, the Government argues that the statements for October mailed to both Rubin and Britzman showed that the scheme was substantially working, in that only one overdraft occurred in October. However, the November statement for A&R mailed to Rubin showed that the A&R account had been almost continually overdrawn during November. According to the Government's theory, this statement, combined with the overdraft notice that was mailed to Rubin on December 6, made the defendants aware that the six to seven day time lag between check exchange dates they had been using was too long. Thus, the Government says, the defendants began to shorten that time lag throughout December.
 
 
 11
 A close examination of the defendants' behavior, however, contradicts any inference of a connection between the time lag they used in December, on the one hand, and receipt of Rubin's November bank statement or the December 6 overdraft notice, on the other hand. The November statement, received by Rubin shortly after it was mailed at the end of November, revealed that the A&R account had been overdrawn twelve times during that month.[4] See Appendix C. Since the account was overdrawn once in late October, the defendants knew upon receiving the November statement that the six to seven day time lag they had been using had produced thirteen overdrafts in a little over a month. It strains credulity to assume that news of the fourteenth overdraft, mailed on December 6, would cause the defendants to change their strategy if news of the first thirteen overdrafts would not. If the Government's theory is to stand up, we must assume that Britzman and Rubin would reduce the time lag upon receipt of the November statement.
 
 
 12
 But the defendants did not do so. On December 5, they exchanged checks for approximately $18,500. They then waited seven days, until December 12, to exchange checks again this time for approximately $20,000. See Appendix A. Since they knew of the thirteen overdrafts in very early December,[5] under the Government's theory they should have performed the second exchange in December well before December 12.
 
 
 13
 Even if we assume that the notice of the fourteenth overdraft mailed on December 6 was "the straw that broke the camel's back," finally convincing the defendants that the time lag had to be shortened, the Government's theory does not fit the defendants' behavior. December 6 was a Friday. Rubin therefore probably received the notice on Monday, December 9 or Tuesday, December 10.[6] Moreover, the defendants knew that the last exchange date had been December 5. Nonetheless, they waited until Thursday, December 12, to make the exchange. They would not have done so if they had relied on the statement and notice to tell them that the six to seven day time lag had to be shortened, as the Government contends.
 
 
 14
 The Government also argues that the defendants used the overdraft notices to further their check-kiting scheme because upon learning of overdrafts they deposited money in the overdrawn account to keep the scheme going. Again, however, the Government's theory does not fit the facts. The first overdraft notice was mailed to Rubin on November 8. The Government contends that Rubin reacted to this notice by making a deposit on November 9 in order to remedy the overdraft. This reasoning assumes that the notice, mailed on November 8, was received by Rubin on the next day.[7] While the correctness of this assumption is possible, it is not probable.
 
 
 15
 The next overdraft notice was mailed to Rubin on November 18. The Government argues that Rubin and Britzman traded checks on November 21 because "based on this notice, Rubin realized that the scheme could not continue unless further funds were deposited in his account." The exchange on November 21, however, took place six days after the previous exchange on November 15. It is therefore likely that the November 21 exchange was made pursuant to the defendants' established pattern of exchanging checks every six to seven days rather than in reaction to the overdraft notice.
 
 
 16
 The defendants' conduct upon receiving the third overdraft notice provides the most telling rebuttal to the Government's theory. The notice, showing a large overdraft of $19,957.77, was mailed on December 6 and probably received by Rubin on December 9 or 10.[8] If the defendants had been utilizing the notices to cover up overdrafts, they would have immediately deposited money in the overdrawn account. In fact, they waited until the next weekly exchange of checks on December 12 to deposit any funds in the A&R account.
 
 
 17
 The Government's final argument is that the statements and overdraft notices furthered the check-kiting scheme by informing the defendants that the bank had not yet become suspicious of their activities and had not initiated an investigation of those activities. We cannot accept this assertion. There is no reason to think that a bank investigating a possibly fraudulent checking account would halt its ordinary mailings to the customer under suspicion while the investigation took place. By doing so the bank would run the risk of unfairly insulting a customer who turned out to be innocent of fraud and of permitting a wrongdoer to flee the jurisdiction.
 
 
 18
 Therefore, the Government has failed to show a connection between any of the eight mailings and the execution of the check-kiting scheme. While the evidence that the defendants committed fraudulent acts is very persuasive, they did not violate the mail fraud statute.
 
 
 19
 The judgment of the district court is reversed and the convictions of the defendants are vacated.
 
 
 20
 APPENDIX A
 ----
 SUMMARY CHART OF ALL CHECKS
 DRAWN ON EITHER ACCOUNT
 (Does Not Include Deposits Of Cash)
Date Account Amount Payee Date Deposited
---- ------- ------ ----- --------------
9-28-74 F & P $ 5,000.00 A & R 9-28-74
9-28-74 A & R 5,000.00 Rubin
--------------------------------------------------------
10-4-74 A & R 5,500.00 F & P 10-4-74
10-4-74 F & P 5,500.00 A & R 10-4-74
--------------------------------------------------------
10-10-74 A & R 8,250.00 F & P 10-11-74
10-10-74 F & P 8,250.00 A & R 10-11-74
--------------------------------------------------------
10-11-74 A & R 800.00 Rubin
--------------------------------------------------------
10-17-74 A & R 9,075.00 F & P 10-18-74
10-17-74 F & P 9,075.00 A & R 10-18-74
--------------------------------------------------------
10-22-74 A & R 1,500.00 Rubin
--------------------------------------------------------
10-24-74 A & R 11,082.50 F & P 10-25-74
10-24-74 F & P 11,000.00 A & R 10-25-74
--------------------------------------------------------
10-25-74 A & R 1,500.00 Rubin
--------------------------------------------------------
10-31-74 A & R 12,100.00 F & P 10-31-74
10-31-74 F & P 12,000.00 A & R 10-31-74
10-31-74 F & P 450.00 Britzman
--------------------------------------------------------
11-6-74 A & R 13,200.00 F & P 11-7-74
11-6-74 F & P 13,000.00 A & R 11-8-74
11-8-74 A & R $ 700.00 Rubin
11-8-74 A & R 1,515.00 Travelers cks,
--------------------------------------------------------
11-9-74 A & R 200.00 Cash
--------------------------------------------------------
11-13-74 A & R 14,300.00 F & P 11-15-74
11-14-74 F & P 14,000.00 A & R 11-15-74
--------------------------------------------------------
11-15-74 A & R 2,850.00 Cash
--------------------------------------------------------
11-16-74 A & R 700.00 Rubin
--------------------------------------------------------
11-21-74 A & R 15,400.00 F & P 11-21-74
11-21-74 F & P 15,000.00 A & R 11-21-74
--------------------------------------------------------
11-22-74 A & R 2,950.00 Cash
--------------------------------------------------------
11-23-74 A & R 300.00 Rubin
--------------------------------------------------------
11-26-74 A & R 16,500.00 F & P 11-29-74
11-26-74 F & P 17,000.00 A & R 11-29-74
--------------------------------------------------------
11-27-74 A & R 700.00 Rubin
--------------------------------------------------------
11-29-74 A & R 3,450.00 Cash
11-29-74 A & R 700.00 Rubin
11-29-74 F & P 400.00 Britzman
--------------------------------------------------------
11-30-74 A & R 500.00 Rubin
--------------------------------------------------------
12-3-84 A & R 1,000.00 Rubin
--------------------------------------------------------
12-5-74 A & R 18,700.00 F & P 12-5-74
12-5-74 F & P 18,500.00 A & R 12-5-74
--------------------------------------------------------
12-6-74 A & R 3,600.00 Rubin
12-12-74 A & R 20,350.00 F & P 12-12-74
12-12-74 F & P 20,000.00 A & R 12-12-74
12-12-74 A & R 190.00 Rubin
--------------------------------------------------------
12-13-74 A & R 3,000.00 Cash
--------------------------------------------------------
12-16-74 F & P 350.56 Britzman
--------------------------------------------------------
12-17-74 A & R 22,000.00 F & P 12-17-74
12-17-74 F & P 22,000.00 A & R 12-17-74
--------------------------------------------------------
12-18-74 A & R 1,000.00 Rubin
--------------------------------------------------------
12-19-74 A & R 4,000.00 Cash
12-19-74 A & R 24,000.00 (F & P) 12-19-74
12-19-74 A & R 750.00 F & P 12-19-74
12-19-74 F & P 24,000.00 A & R 12-19-74
--------------------------------------------------------
12-23-74 A & R 27,000.00 F & P 12-23-74
12-23-74 F & P 25,000.00 A & R 12-23-74
12-23-74 A & R 1,200.00 Rubin
12-23-74 F & P 2,650.00 Cash
 Britzman
--------------------------------------------------------
12-26-74 A & R 28,125.00 F & P 12-26-74
12-26-74 F & P 25,000.00 A & R 12-27-74
--------------------------------------------------------
 
 12-29-74 A & R 1,100.00 Rubin
 APPENDIX BTATABLE
 APPENDIX C
 
 21
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 
 
 [1]
 18 U.S.C. § 1341 states:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 
 
 [2]
 An example may help to clarify the operation of the scheme. On October 10, Rubin drew a check on A&R's account for $8,250 payable to Forms & Procedures ("F&P") and Britzman drew a check on F&P's account for $8,250 payable to A&R. The next day, October 11, Britzman deposited the check Rubin had written in F&P's account and Rubin deposited the check Britzman had written in A&R's account. Under the accounting system employed by both banks, each man had immediate use of $8,250 even though the checks deposited had not yet cleared. Of course, when the checks cleared, each account would have insufficient funds to cover the amounts drawn on them unless the $8,250 deposited was still there. But no overdraft would be apparent during the interval necessary for clearance
 On October 11, Rubin withdrew $800 in cash from the A&R account. In order to cover the fact that there was now only $7,450 in the A&R account, insufficient to cover the $8,250 check to F&P that would soon clear, Rubin and Britzman had to keep exchanging checks. Therefore, they exchanged checks for $9,075 on October 17. Since a major purpose of the scheme was to allow permanent cash withdrawals, the exchanges had to be for continually increasing amounts in order to account for the continually increasing sum of cash which Rubin had withdrawn. See Appendix A.
 
 
 [3]
 These mailings included monthly statements for September, October, and November for F&P's account and monthly statements for October and November for A&R's account, all mailed at the end of the applicable month. The overdraft notices were for A&R's account and were mailed on November 8, November 18, and December 6, 1974
 
 
 [4]
 The bank only sent Rubin overdraft notices on two of the twelve occasions
 
 
 [5]
 The record does not reveal the exact date on which Rubin received the November statement. The Government's account of the facts implies, however, that it was mailed before the third overdraft notice was mailed on December 6
 
 
 [6]
 The record does not show the exact date on which Rubin received any of the overdraft notices
 
 
 [7]
 See note 6 supra
 
 
 [8]
 See note 6 supra