**UNITED STATES of America**

v.

**David E. KELLY & Matthew Palmer, Jr.**

**Crim. No. 77–250.**

United States District Court,
E. D. Pennsylvania.

Jan. 16, 1981.

Walter S. Batty, Jr., Asst. U. S. Atty., Philadelphia, Pa., for the U. S.

J. Shane Creamer, Philadelphia, Pa., for defendants.

## OPINION

DITTER, District Judge.

## I. INTRODUCTION

Defendants were convicted of five substantive counts of mail fraud and a sixth count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 371 respectively. Presently before me are their post-trial motions in which they contend principally that the acts for which they were convicted did not comprise a "scheme or artifice to defraud" within the meaning of the mail fraud statute and that the mails were not utilized for the purpose of executing the scheme. After a careful consideration of the matters raised by the defendants, I have concluded that the Government did allege and prove a cognizable violation of the mail fraud statute and conspiracy. Accordingly, the post-trial motions will be denied.

## II. FACTUAL BACKGROUND

While employed at Sperry Univac's applications development center[1] in Blue Bell, Pennsylvania, defendants David E. Kelly and Matthew Palmer, Jr.,[2] attempted to

---

1. The function of the applications development center is to develop and maintain programs which can be utilized by Sperry Univac's customers. (Tr. 1-22)

2. Palmer was employed as a group manager within the applications development center. Kelly was the manager of the engineering/scientific group, a subdivision of the applications development center, which developed and

develop a system for computerizing the generation of sheet music. Simply described, the system involved the programming of musical scores into a computer storage facility and subsequently transcribing the programs into manuscript form by means of a plotting device.[3] This stands in distinct contrast to the process currently utilized in the music business which consists of someone's reading a manuscript to an artist who manually draws the notes and symbols. The defendants' computerized process would purportedly have resulted in significant savings of both time and cost to the music publishing industry.[4] In developing this program, the defendants utilized substantial amounts of computer time and storage capacity within the central processing unit of the applications development center. At no time did anyone from Sperry Univac give Kelly or Palmer authority to make such use of the company's resources nor did either defendant advise anyone of their activities.

While still employed at Univac, Kelly, Palmer, and an associate, Sam Casale, entered into a business agreement with Broomall Industries, Inc. "to establish a working relationship with regard to the development and promotion of a Computer Aided Manuscript Preparation Service" (Tr. 5–83). Under the terms of the agreement, Broomall was to arrange financing and to furnish defendants with access to a flat bed plotter and other graphics equipment to permit the further development of what was christened the "allegro" system.[5] Thereafter, Kelly, Palmer, Casale, and Andrew Trolio, president of Broomall, caused certain promotional materials to be mailed to five musical publishing companies inviting them to send representatives to an allegro demonstration.

Eventually, defendants' use of Univac's resources was discovered by company personnel. Following an investigation by Univac security officials and the F.B.I., Kelly and Palmer were indicted on five counts of mail fraud and one count of conspiracy to commit mail fraud. In essence, the indictment alleged that by unauthorizedly utilizing their employer's computer time and storage facilities for the development of a private business venture, defendants defrauded Univac of their loyal and faithful services as employees and used the United States mails in furtherance of their fraudulent scheme by causing the promotional materials to be mailed. The defendants were found guilty by a jury on all counts.

## III. GENERAL CONSIDERATIONS

■ In view of the unique factual circumstances giving rise to these convictions, it is necessary to consider the general purpose and scope of the mail fraud statute before addressing the many contentions advanced by the defendants. In pertinent part, 18 U.S.C. § 1341 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud . . . for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office . . . or knowingly causes to be delivered by mail according to the direction thereon . . . shall be fined not more than $1000.00 or imprisoned not more than five years or both.

maintained computer programs for use by the company's engineering and other science oriented customers. (Tr. 1–22)

3. A plotting device is a machine which is used to convert computer output into high quality graphic display. It consists of a moving arm with a pen attached. The computer essentially causes the arm to move in accordance with information which has been programmed into it. In this case, the plotter was used to draw clefs, ledgers and other graphic components of sheet music. (Tr. 2–7—2–9; 5–71)

4. Unfortunately, the system did not fulfill its theoretical potential. It never became capable of turning out a complete musical score without making numerous errors which required human intervention to correct. (Tr. 7–9)

5. Several months after the promotional demonstration was held, the business venture was incorporated as CAMPS, INC. with Kelly, Palmer, and Casale each as a 10 per cent shareholder. CAMPS is an acronym for Computer Aided Manuscript Preparation Service (Tr. 5–95).

The essential elements of mail fraud are (1) a scheme or artifice to defraud and (2) the use of the United States mails in execution of the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. McNeive*, 536 F.2d 1245, 1247 (8th Cir. 1976); *United States v. Dreer*, 457 F.2d 31, 33 (3d Cir. 1972).[6] The broad, amorphous statutory language, coupled with the lack of legislative history explaining its intended meaning, has generally permitted the courts considerable latitude in determining what types of schemes come within the purview of the statute. Interpreting the statute for the first time, the Supreme Court held that the perimeters of the term "scheme or artifice to defraud" are not limited to common law concepts of fraud or false pretenses and that the existence of such a scheme is not contingent upon a violation of state law. *Durland v. United States*, 161 U.S. 306, 313–314, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896).[7] The effect of such an expansive interpretation of the statute was summarized by the United States Court of Appeals for the Fourth Circuit:

> As a result of the failure to limit the term "scheme or artifice to defraud" to common law definitions of fraud and false pretenses and schemes prohibited by State law, the mail fraud statute generally has been available to prosecute a scheme involving deception that employs the mails in its execution that is contrary to public policy and conflicts with accepted standards of moral uprightness, fundamental honesty, fair play and right dealing.

*United States v. Mandel*, 591 F.2d 1347, 1361 (4th Cir.) aff'd per curiam in relevant part 602 F.2d 653 (1979) (en banc) cert. denied 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). Courts have relied upon this broad interpretation of "a scheme to defraud" to hold many types of schemes violative of the mail fraud statute. As one commentator recently noted:

> First enacted in 1872, the mail fraud statute, together with its lineal descendant, the wire fraud statute, has been characterized as the "first line of defense" against virtually every new area of fraud to develop in the United States in the past century. Its applications, too numerous to catalog, cover not only the full range of consumer frauds, stock frauds, land frauds, bank frauds, insurance frauds, and commodity frauds, but have extended even to such areas as blackmail, counterfeiting, election fraud, and bribery. In many of these and other areas, where legislatures have sometimes been slow to enact specific prohibitory legislation, the mail fraud statute has frequently represented the sole instrument of justice that could be wielded against the ever-innovative practitioners of deceit.

Rakoff, *The Federal Mail Fraud Statute (Part I)*, 18 Duquesne Law Review 771, 772 (1980).

It is clear from this brief discussion that the propriety of defendants' mail fraud convictions cannot be evaluated in a technical or mechanistic fashion. Rather, they must be considered in light of the broad language of the statute itself, the expansive interpretation which it has been accorded by the courts, and its general utility in meeting the multifarious types of schemes, complex or simple, which may be devised.

## IV. THE POST-TRIAL MOTIONS

The defendants have filed a motion in arrest of judgment in which they challenge the sufficiency of the indictment, a motion

---

**6.** The statute does not specifically state that intent to defraud is a necessary element of a mail fraud violation. However, because only a scheme to defraud and not actual fraud is required, it is well established that fraudulent intent must be proven. *United States v. Diggs*, 613 F.2d 988, 997 (D.C.Cir.1979) cert. denied 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980); *United States v. Brown*, 540 F.2d 364, 374 (8th Cir. 1976).

**7.** It is frequently held that the "gist" of a mail fraud violation is not the scheme to defraud itself but rather the use of the United States mails in its execution. *United States v. Young*, 232 U.S. 155, 159, 34 S.Ct. 303, 304, 58 L.Ed. 548 (1914); *United States v. Mandel, supra* at 1360. The practical effect of this interpretation is to permit the prosecution of fraudulent schemes which are not otherwise proscribed by federal or state law.

for judgment of acquittal wherein they contend that the evidence failed to support the conviction, and a motion for new trial in which they assert that I committed reversible error in refusing certain requested points for charge. In essence, the defendants argue that the indictment did not charge nor did the evidence establish that they engaged in a cognizable scheme to defraud which was executed by the use of the mails. These contentions will be tested not only on the basis of the indictment but also in light of the evidence adduced at trial and the instructions given to the jury. *United States v. Brown*, 583 F.2d 659, 664 (3d Cir. 1978) cert. denied 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). In considering the evidence, of course, the record must be examined in a light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1944).

A. Scheme to Defraud

 The indictment in this case charged defendants with using Univac's computer time and computer storage capacity for their own personal benefit thus defrauding their employer of the honest and faithful performance of their duties as employees. It is well established that a scheme which is directed at depriving an employer of the honest and faithful services of its employees or of its right to have its business conducted honestly may constitute a "scheme to defraud" within the meaning of the mail fraud statute. *United States v. Reece*, 614 F.2d 1259, 1261 (10th Cir. 1980); *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir.) cert. denied —— U.S. ——, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); *United States v. Lea*, 618 F.2d 426, 429 (7th Cir.) cert. denied —— U.S. ——, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980); *United States v. Bryza*, 522 F.2d 414, 421–22 (7th Cir. 1975) cert. denied 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. George*, 477 F.2d 508, 512 (7th Cir.) cert. denied 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973); *United States v. Briel*, No. 80–318 slip op. at 2–3 (E.D.Pa. 11/10/80); *United States v. Procter & Gamble Compa-*

*ny*, 47 F.Supp. 676, 678 (D.Mass.1942). The defendants advance a number of arguments in assailing the validity of their convictions under this theory. Their threshold contention is that the mail fraud statute does not encompass a scheme to deprive an employer in the private sector of the honest and faithful services of its employees. This argument is completely without merit. It is true that the acceptance of bribes, kickbacks, and other acts of malfeasance by public office holders or public employees may constitute a mail fraud violation since such conduct defrauds citizens of their right to the office holders' honest and faithful services. *United States v. Mandel, supra* at 1362; *United States v. Diggs*, 613 F.2d 988, 998 n. 54 (D.C.Cir.1979) cert. denied 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980); *United States v. Brown*, 540 F.2d 364, 374 (8th Cir. 1976). However, nothing in the text of the mail fraud statute or in the theory underlying its application to political office holders dictates its inapplicability to the fraudulent activities of a private employee. Indeed, the statute has repeatedly and successfully been used to prosecute recreant employees in the private sector. *See e. g. United States v. Reece*, supra; *United States v. Lea*, supra; *United States v. McCracken*, 581 F.2d 719 (8th Cir. 1978); *United States v. Bryza, supra; United States v. George, supra; United States v. Brodbeck*, 430 F.Supp. 1056 (E.D.Wis. 1977).

 The defendants' next contention is that an essential element of a scheme to defraud under the mail fraud statute is the intent to deprive the person being defrauded of money or some other tangible property right. They assert that the Government did not allege or prove that the purpose of defendants' fraudulent scheme was to obtain money from Univac and therefore argue that it failed to establish the existence of a scheme to defraud within the meaning of 18 U.S.C. § 1341. As support for this proposition, defendants rely exclusively upon *Hammerschmidt v. United States*, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924). A fair reading of that decision, however,

clearly reveals that it does not compel the restrictive interpretation of the mail fraud statute urged by the defendants. *Hammerschmidt* did not deal directly with a mail fraud conviction. Rather, it concerned the indictment of thirteen persons charged with conspiracy to defraud the United States by attempting to induce individuals to refuse to register for the draft. The Court held that a conspiracy to defraud the Government necessarily entailed an element of "misrepresentation, chicane or overreaching of those charged with carrying out the governmental intention." *Id.* at 188, 44 S.Ct. at 512. In dicta, it contrasted that holding with an earlier Court of Appeals decision which had determined that trickery or misrepresentation was not an essential element of a mail fraud conviction when the purpose of the scheme to defraud is to deprive another of tangible property rights. Hence it is clear that *Hammerschmidt* does not present a definitive or binding interpretation of the mail fraud statute and cannot support the restrictive construction urged by defendants.

The controlling interpretation of the statute is illustrated in *United States v. States*, 488 F.2d 761 (8th Cir. 1973) cert. denied 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974) and 417 U.S. 950, 94 S.Ct. 3078, 41 L.Ed.2d 671 (1974). In *States*, the defendants were indicted on multiple counts of mail fraud for allegedly falsifying voter registration affidavits in order to cause absentee ballots to be sent to non-existent voters. In rejecting defendants' contention that the mail fraud statute encompassed only schemes directed at defrauding a victim of money or property, the Court held that neither the language of the statute nor its legislative history compelled such a conclusion. It further determined that in view of the purposes of the statute and the open ended concept of fraud which it encompass-

es, it would be anomalous to restrict its reach to schemes directed only to the deprivation of tangible property interests. *Id.* at 763–66. It is important to note that the decisions which have considered the issue are uniformly in accord with the holding in *States*. *United States v. Condolon*, 600 F.2d 7, 8 (4th Cir. 1979); *United States v. Louderman*, 576 F.2d 1383, 1388 (9th Cir.) cert. denied 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978); [8] *United States v. Brown*, 540 F.2d 364, 374 (8th Cir. 1976).

Similarly, I am unpersuaded by the defendants' analogous contention that even if the statute does not require that the purpose of the scheme be to deprive the employer of money, it must in some manner be directed against the employer's economic interests. In *United States v. Procter & Gamble, supra,* the court articulated the rationale underlying the recreant employee doctrine:

> When one tampers with that relationship for the purpose of causing the employee to breach his duty he in effect is defrauding the employer of a lawful right. The actual deception that is practised is in the continued representation of the employee to the employer that he is honest and loyal to the employer's interests.

47 F.Supp. at 678. In *United States v. Bryza, supra,* the Court determined that a purchasing agent's actions in accepting payments from his employer's suppliers constituted a violation of the mail fraud statute notwithstanding the fact that his activities did not work to the employer's economic detriment:

> [I]t is clear that International Harvester was deprived of Bryza's honest and faithful services in addition to the right to make the best possible purchase. Although Bryza argues he obtained the best possible contracts for his employer, I–H

**8.** Both *Louderman* and *Condolon* dealt with convictions under the wire fraud statute, 18 U.S.C. § 1343, which proscribes the use of the facilities of interstate communication to execute "any scheme or artifice to defraud." As the Court of Appeals recently held, the wire and mail fraud statutes are *in pari materia* and cases involving one of the statutes may proper-

ly be utilized in interpreting the other. *United States v. Giovengo*, 637 F.2d 941, at 944 (3d Cir. 1980); *United States v. Tarnopol*, 561 F.2d 466, 475 (3d Cir. 1977). *See also: United States v. Louderman, supra* at 1387 n. 3; *United States v. Donahue*, 539 F.2d 1131, 1135 (8th Cir. 1976).

was entitled to negotiate those purchases with the knowledge of its employee's interest. Thus, even though I–H was satisfied with Bryza's job performance and the products he purchased for I–H from its suppliers, and despite the fact that no preferential treatment, beyond receiving business, was accorded the suppliers, that the suppliers' prices to I–H were fair and reasonable, that I–H was never shown to be dissatisfied with the suppliers' prices or products, and that Bryza insisted upon efficiency, quality and fair prices from the suppliers, Bryza's conduct nonetheless falls within the purview of the mail fraud statute. The fraud consisted in Bryza's holding himself out to be a loyal employee, acting in I–H's best interests, but actually not giving his honest and faithful services, to I–H's real detriment.

522 F.2d at 422.

In the recent case of *United States v. Von Barta*, 635 F.2d 999, (2d Cir. 1980), defendant was a trader and salesman of government bonds for a small securities firm. While so employed, he helped to form a corporation which speculated in government bonds and eventually became one of the firms most active accounts. At no time did Von Barta advise his superiors of his interest in the corporation which ultimately became insolvent resulting in a $1 million loss for defendant's employer. Von Barta was indicted under the mail fraud statute and charged with defrauding his employer of his loyal and faithful services. The Court of Appeals, in reversing the District Court's dismissal of the indictment, held that the defendant's failure to render honest and faithful services to his employer when combined with his concealment of his personal interest in the insolvent corporation and his misrepresentations concerning its financial strength stated a cognizable offense of the mail fraud statute. *See also:*

United States v. Bohonus, supra; United States v. Bush, 522 F.2d 641 (7th Cir. 1975), cert. denied, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976). United States v. George, supra; United States v. Brodbeck, supra.

■ The general principles articulated in these decisions are controlling here. The essence of the fraud involved in each was the employee's manipulation of his employment in some way designed to bring him concealed financial gain thus depriving his employer of the undivided loyalty in job performance to which an employer is entitled. I therefore hold that in this case, it is simply of no moment that defendants' scheme was not directed against Univac's economic interests [9] since it was directed at depriving Univac of the loyal and conscientious performance of their duties as employees.

As the Court emphasized in *Von Barta*, however, the mail fraud statute requires more than a failure to render loyal and faithful service; there must also be a scheme to deceive, mislead, or conceal material information. It is well established that such a scheme need not be fraudulent on its face "but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978). *See also: United States v. Bohonus, supra*, at 1172; *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979). In this respect, the defendants contend that there has been no showing that they had the required intent to defraud Univac and thus, no proof that they violated the mail fraud statute.

I cannot agree. "[A]n employee owes his employer a duty of loyalty which includes a

---

**9.** I note parenthetically that there was testimony to the effect that defendants' activities had adversely affected Univac's long term economic interests. Charles Card, group manager of Univac's computation service facility, testified that as a result of the extensive amount of computer space taken up by the music programming, Univac may have invested more money in disc storage and memory capacity than was necessary in light of actual business related usage (Tr. 2–64—2–65). He further indicated that Kelly and Palmer may not have aggressively pursued the development of certain packages which subsequently proved popular with Univac's customers (Tr. 2–66).

duty not to conceal facts known to him which he has reason to believe are material to the employer's conduct of his business and affairs." *United States v. Bush, supra* at 652. *See also: United States v. Bohonus, supra* at 1171. A review of the record shows more than ample evidence from which the jury could have determined that defendants took affirmative steps to conceal their unauthorized computer use from Univac. From this evidence, the jury could have inferred it was their intent to defraud Univac. Charles Card testified that in response to a terminal listing advising the computer users to review their files and eliminate any unnecessary usage, 15 files, some of which had starting indicators of K or M,[10] and which were primarily concerned with plotting routines or music were erased almost immediately (Tr. 1–60—1–65). From this testimony, the jury could certainly have inferred that Kelly or Palmer or both had selectively erased certain programs to escape detection. Further, Card testified that Palmer and Kelly would have worked together in preparing the engineering/scientific group's preliminary budget for fiscal year 1977. He stated that the preliminary budget was part of a general procedure in which each of the departments within the applications development center set forth their plans and objectives for the fiscal year involved so that management could authorize the funding necessary to support each program (Tr. 2–30). No project of the group could be authorized without going through the preliminary budget or some other type of management review (Tr. 2–34—2–35). Despite the fact that the music programs took up a substantial portion of the engineering/scientific group's available storage space, no funding authorization for these programs was requested nor was mention of them made in the group's budget projection (Tr. 2–34). Finally, Lester Weyant, a programmer at Univac who was hired by the defendants to "translate" the programmed music from COBOL to FORTRAN computer language[11] testified that Kelly had instructed him to "keep the entire matter quiet for some period of time." (Tr. 6–32). It is clear that the jury could have determined that Kelly and Palmer attempted to conceal their CAMPS related activities from their employer.

The testimony was extensive and uncontradicted that Univac did not generally permit the use of its facilities to promote outside business ventures by its employees (Tr. 2–79—2–80; 3–87); that the use of its facilities for *any* purpose unrelated to business was permissible only when authorization was first obtained (Tr. 2–75; 3–35)[12] that defendants had never sought or received authorization to utilize Univac's facilities to develop the allegro system (Tr. 2–45; 6–3), and that had they sought authorization for such activities it would have been denied (Tr. 6–19—6–20). In addition, both Kelly and Palmer had received and signed Univac's employee confidential information and invention agreement which gave Univac sole ownership of "any and all reports, drawings, blueprints, data writings and

**10.** Card further testified that it was not unusual for each computer programmer to use an indicator generally based upon an initial or derivation of his name (Tr. 3–17). The jury could certainly have concluded that "K" referred to Kelly and "M" to Matthew Palmer.

**11.** FORTRAN is an acronym for "formula translator" and is a computer language utilized for programming science related matters. COBOL is an acronym for "common business oriented language" and is utilized in programming business related matters (Tr. 6–27).

**12.** Defendants elicited a considerable amount of evidence that Univac employees routinely used the computer facilities for playing games such as "Star Trek" and "chess" and that it was Univac's policy to permit use of its computer facilities for educational and other purposes unrelated to Univac's business. This evidence does not derogate from the fraudulent nature of defendants' activities. The testimony was clear that Univac permitted the use of the computer terminals to play games in order to give its employees confidence in their ability to utilize the computer equipment (Tr. 2–75). Further, such use was restricted to non-business hours (Tr. 2–75—2–76). In addition, the utilization of the facilities for outside activities was permissible only when authorization was obtained from the appropriate managerial or supervisory personnel (Tr. 2–77).

technical information made or prepared" during the course of their employment with Univac (Tr. 2–42—2–43). Finally, the government introduced Univac's conflict of interest policy statement which specifically proscribed the "engaging or continuing in outside business, or employment by an outside company that permits encroachment on Sperry Univac's call for the full services of its employees, even though there may not be any other conflict." (Tr. 2–40—2–41). Despite the fact that only Palmer signed a certificate of no conflict of interest (Tr. 2–38), the jury could have inferred that both Kelly and Palmer, as supervisory personnel, were familiar with Univac's policy regarding the outside business activities of its employees.

Thus, it is abundantly clear on this record that Kelly and Palmer were aware of Univac's policy against the use of its facilities for personal business ventures. They nevertheless made extensive use of the company's computer facilities in furtherance of their own pecuniary interests, took steps to conceal their activities and willfully failed to seek authorization for them. The evidence was more than sufficient to sustain the jury's determination that the defendants acted with intent to defraud.

Defendant Palmer next contends that there was insufficient evidence of his own unauthorized use of the Univac computer facilities or of his knowledge of Kelly's activities to sustain his conviction under the substantive mail fraud counts. I cannot agree. One of the computer printouts identified by Charles Card as representing the programming of musical compositions had a mailing address [13] of "M. Palmer" (Tr. 2–23). As already noted, Card also testified that many of the programs containing musical scores or plotting routines had starting indicators of "K" or "M" (Tr. 1–60). Finally, F.B.I. Inspector Charles Owens, who interviewed Palmer during the Bureau's investigation into this matter, testified that Palmer told him that he "began preliminary

work on the software package to develop this system while employed at Univac." (Tr. 7–79). Hence, there was adequate evidence from which the jury could have determined that Palmer directly participated in the unauthorized use of Univac's computer facilities.

■ More significantly, the mail fraud statute, by its own terms, proscribes a *scheme* to defraud and is not necessarily limited to direct participation in all of the concrete actions taken to effectuate the scheme. Rather, a mail fraud conviction can be based upon a defendant's willful participation in a scheme to defraud with knowledge of its fraudulent nature. *United States v. Pearlstein, supra,* at 537; *United States v. Tiche,* 424 F.Supp. 996, 1001 (W.D.Pa.) aff'd mem. 564 F.2d 90 (3d Cir. 1977). Once such willful participation and knowledge is shown, "[s]o long as a transaction is within the general scope of a scheme on which all defendants had embarked, a defendant not directly connected with a particular fraudulent act is nonetheless responsible therefore if it was of the kind as to which all parties had agreed." *United States v. Amrep Corporation,* 560 F.2d 539, 545 (2nd Cir. 1977) cert. denied 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978). *See also: United States v. Rodgers,* 624 F.2d 1303, 1308–1309 (5th Cir. 1980); *United States v. Cohen,* 516 F.2d 1358, 1364 (8th Cir. 1975). In the instant case, there was an abundance of evidence to support a finding of Palmer's knowledge of and participation in the general scheme to defraud. Palmer was Kelly's immediate supervisor during his tenure at Univac (Tr. 1–40). Given Palmer's supervisory position and expertise as a computer programmer, the jury could, at the very least, have inferred that he had knowledge of Kelly's activities. Further, the evidence clearly established that Palmer actively participated in the formation of the business venture with Broomall, Inc. and its subsequent incorpora-

---

**13.** Card testified that each computer listing had a "mailing address" which was essentially the name of the user. The purpose of the mailing address was to allow the system administrator to identify the user and deliver the listing to him if it was not claimed within a certain period of time after the computer's use (Tr. 2–6).

tion as CAMPS, Inc. (Tr. 5–81—5–85); in Weyant's hiring as a "translator" (Tr. 6–28) and in the completion of the promotional materials which were sent to the various publishing houses (Tr. 5–87). In short, there was ample evidence to establish Palmer's knowledge of and participation in the overall scheme to defraud Univac. Under the principles examined above, he may be held responsible not only for his own participation but for the fraudulent activities of his coschemer David Kelly.[14]

■■■ The defendants' final contention with respect to the existence of a scheme to defraud is that the evidence is insufficient to sustain the conviction of conspiracy to commit mail fraud as alleged in Count VI of the indictment. This argument is without merit. "[P]roof of a mail fraud scheme involving two or more persons is analogous to the nature of proof in a conspiracy." *United States v. Cohen, supra* at 1364. *See also: United States v. Serlin*, 538 F.2d 737, 743 (7th Cir. 1976); *United States v. Grow*, 394 F.2d 182, 203 (4th Cir.) cert. denied 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968).[15] Based upon the foregoing discussion, I conclude that there was sufficient evidence implicating Kelly and Palmer in a conspiracy to commit mail fraud.

### B. Use of the Mails

Thus far, this discussion has been concerned solely with the first element of a mail fraud violation—the existence of a scheme to defraud coupled with the necessary intent to do so. It is axiomatic, however, that:

> The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.

*Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944).[16] In this respect, the defendants attack the sufficiency of the Government's evidence as to the use of the mails on two levels. They first contend that the evidence was insufficient to support a determination that the promotional materials were "place[d] in any post office or authorized depository for mail matter" as alleged in Counts III and V of the indictment or were "knowingly cause[d] to be delivered by mail" as alleged in Counts I, II, and IV. They further contend that the evidence failed to prove that the mailings were "for the purpose of executing" the scheme to defraud.

■■■ Defendants premise their first argument on the language of the indictment. In Counts I, II, and IV the defendants were accused of causing "to be delivered by mail" the promotional materials described therein. By contrast, Counts III and V simply alleged that they caused the materials "to be placed in an authorized depository for mail matter." It is asserted that by using the

---

14. As is discussed in more detail, *infra*, I am unable to agree with defendants' assertion that their development of the allegro system can be neatly divided into two distinct phases—the use of Univac's computer facilities and the formation of CAMPS, INC. and its marketing activities. Rather, I view both of these activities as aspects of an overall scheme to defraud. Therefore, Palmer's activities concerning CAMPS, INC. and the allegro demonstration may properly be viewed as evidencing his knowledge of and participation in the scheme to defraud Univac.

15. Principles applicable to the law of conspiracy are frequently utilized in cases concerned with a mail fraud scheme involving two or more persons. It is well settled, for example, that once the existence of a scheme to defraud is established, declarations by one defendant may be attributed as evidence to the others,

*United States v. Freeman*, 619 F.2d 1112, 1123 (5th Cir. 1980); *United States v. Amrep Corporation, supra* at 545, and that when one coschemer utilizes the mails in furtherance of the scheme to defraud, all other coschemers are thereby implicated. *United States v. Toney*, 598 F.2d 1349, 1355 (5th Cir. 1979) cert. denied 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980); *United States v. Rodgers*, 624 F.2d 1303, 1308 (5th Cir. 1980); *United States v. Perkal*, 530 F.2d 604, 606 (4th Cir.) cert. denied 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976).

16. As was indicated at page 498 of this opinion, however, the existence of a "scheme to defraud" under the mail fraud statute is not contingent upon the violation of a state law. *Durland v. United States*, 161 U.S. 306, 313–14, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1895).

divergent language in the indictment, the Government obligated itself to prove mailing under Counts III and V and actual delivery under Counts I, II, and IV. Defendants then contend that the evidence of mailing and delivery was insufficient to support convictions of the acts alleged. This argument is not persuasive. It is well settled that in order to establish a violation of the mail fraud statute it is not necessary to show that defendants actually mailed anything themselves. It is sufficient to prove that they *caused* it to be done. *Pereira v. United States, supra*, 347 U.S. at 8, 74 S.Ct. at 362; *United States v. Lea*, 618 F.2d 426, 430 (7th Cir.) cert. denied —— U.S. ——, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980). The standards for determining when one "causes" a mailing to occur for purposes of the mail fraud statute are equally well established:

> Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he "causes" the mails to be used.

*Pereira v. United States, supra*, 347 U.S. at 8–9, 74 S.Ct. at 363. *See also: United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). Here, Andrew Trolio testified unequivocally that compilation of the promotional materials which were ultimately mailed, including a brochure, a letter to the publishing companies, and a self-addressed response card, had been a joint effort among "Dave Kelly, Matt Palmer, Sam Casale and myself." (Tr. 5–87—5–89). Further, he testified that the materials were mailed to a selected group of publishers by his secretary, Victoria Franchetti (Tr. 5–91). Correspondingly, Franchetti testified that she had, in fact, mailed the materials:

> Q. And approximately when did you send out the invitations and the letters?
>
> A. Well, in the early part of the month of January, I believe.
>
> Q. In 1976?
>
> A. Yes.
>
> Q. And you personally supervised the mailing?
>
> A. Yes.
>
> Q. What about getting the letters to the Post Office, how was that handled?
>
> A. Well, I would mail them. I mailed them.

(Tr. 7–25—7–26). Viewing this evidence in the light most favorable to the Government, I conclude that this line of testimony was more than sufficient to permit the jury to determine that the defendants "caused" the use of the mails within the meaning of 18 U.S.C. § 1341.[17]

---

**17.** I am unable to agree with defendants' assertion that under Counts I, II, and IV of the indictment, the government obligated itself to prove that the promotional materials were actually delivered to the publishing houses. A similar argument was advanced in the recent case of *United States v. Anderson*, 618 F.2d 487 (8th Cir. 1980). Counts 3–10 of a mail fraud indictment charged defendant with "plac[ing] in an authorized depository for mail matter" eight change of address forms while counts 11 through 21 charged him with causing the forms to be delivered. At trial, the Government proved that Anderson had forwarded to the IRS 28 change-of-address forms with fictitious male names for purposes of obtaining refunds on the same number of fraudulent 1040 forms which he had previously filed. The defendant contended that while the evidence may have been sufficient to prove that Anderson knowingly *caused* the change of address forms to be delivered as charged in Counts 11 through 21, there was no evidence that he personally mailed them as charged in Counts 3–10.

Therefore, he argued that the evidence was at variance with the allegations in Counts 3–10 of the indictment. In rejecting this argument, the Court held as follows:

> Here, the evidence introduced at trial showed that Anderson prepared the change-of-address cards and that the cards were processed through the mail. Substantial evidence was presented to the jury from which it could conclude that Anderson, at a minimum, "knowingly caused to be delivered by the mail" the cards in violation of section 1341. In fact, as stated above, Anderson does not appeal those counts of the indictment which contained the former language. The variance between the words in the indictment and the proof offered at trial did not prejudice or affect the substantial rights of Anderson.

*Id.* at 490. So here, the Government introduced more than ample evidence from which the jury could have determined that one of the elements of a mail fraud violation had been met, i. e., defendants knowingly caused the

The defendants' more substantial contention is that the nexus between the mailing of the promotional materials and the accomplishment of their scheme to defraud Univac was too attenuated to meet the statutory requirement that the mailing be "for the purpose of executing" the fraudulent scheme. In evaluating this argument, the essential question presented is "whether or not the mailings were sufficiently closely related to respondent's scheme to bring his conduct within the statute." *United States v. Maze, supra,* 414 U.S. at 399, 94 S.Ct. at 648; *United States v. Price,* 623 F.2d 587, 593 (9th Cir. 1980); *United States v. Tarnopol,* 561 F.2d 466, 471–72 (3d Cir. 1977). When applying this general standard, it is important to note that "the close relation of the mailings to the scheme does not turn on time or space but on the dependence in some way of the completion of the scheme or the prevention of its detection on the mailings in question." *United States v. Tarnopol, supra* at 472, quoting *United States v. LaFerriere,* 546 F.2d 182, 187 (5th Cir. 1977). Mailings which occur before the scheme has begun or after its object has been accomplished are not sufficiently related to the execution of the plan to support a mail fraud conviction. *United States v. Georgalis,* 631 F.2d 1199, 1204 (5th Cir. 1980); *United States v. Brown,* 583 F.2d 659, 664 (3d Cir. 1978) cert. denied 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979).

An examination of the cases in which these general principles have been applied will prove helpful in resolving the issues presented here. The Supreme Court has on several occasions considered the circumstances under which the use of the mails may be deemed "for the purpose of executing" a scheme to defraud. In *Kann v. United States, supra,* the defendant was convicted of two counts of mail fraud stemming from his participation in a scheme in which he and several others fraudulently obtained and cashed certain checks. The use of the mails upon which the mail fraud

indictment was premised was the forwarding of the checks from the payor bank to the drawee bank for collection. In reversing the convictions, the Court held that the object of the scheme to defraud was the receipt of money which had been obtained "irrevocably" by the defendant upon cashing the checks. Thus, the mailing of the checks occurred after the object of the scheme had been achieved and could not have been incidental to its execution. *See id.,* 323 U.S. at 94, 65 S.Ct. at 150. This holding should be contrasted with the Court's subsequent decision in *Pereira v. United States, supra.* In *Pereira,* the defendant married a wealthy widow for the sole purpose of cheating her out of money. The transaction which led to his mail fraud conviction was summarized by the court as follows:

> Pereira asked his then wife if she would join him in the hotel venture and advance $35,000 toward the purchase price of $78,-000. She agreed. It was then agreed, between her and Pereira, that she would sell some securities that she possessed in Los Angeles, and bank the money in a bank of his choosing in El Paso. On June 15, she received the check for $35,000 on the Citizens National Bank of Los Angeles from her brokers in Los Angeles and gave it to Pereira, who endorsed it for collection to the State National Bank of El Paso. The check cleared, and on June 18, a cashier's check for $35,000 was drawn in favor of Pereira.

*Id.,* 347 U.S. at 5, 74 S.Ct. at 361. In sustaining defendant's conviction, the Court first noted that the object of his scheme was the collection of the proceeds represented by the $35,000.00 cashier's check. The procurement of the cashier's check was in turn contingent upon the mailing of Mrs. Pereira's check from El Paso to the drawee bank in Los Angeles. Hence, in this case unlike *Kann,* the use of the mails was instrumental to the receipt of the fruits of the scheme and defendant's conviction under the mail fraud statute was upheld.

mailing of the promotional materials in the execution of their scheme to defraud. It was not necessary for it to prove actual delivery to

meet the divergence in the language of the indictment.

In *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), the defendants were convicted of mail fraud for unauthorizedly using their employer's credit card to obtain gasoline and other products for their personal use. As in *Kann*, the Court determined that "[T]he scheme . . . had reached fruition when [defendants] received the goods complained of." *Id.* at 393, 80 S.Ct. at 1184. The mailing of the invoices to defendants' employer was held to have occurred after the consummation of the fraudulent scheme and was therefore unrelated to its execution. Similarly, in *United States v. Maze, supra,* the defendant used a stolen Bank Americard to obtain food and lodging at a number of motels. Each motel then mailed to the bank which had issued the credit card invoices for the goods and services. The Court held *Kann* and *Parr* to be dispositive and reversed the conviction on the grounds that "[r]espondent's scheme reached fruition when he checked out of the motel and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." *Id.* 414 U.S. at 402, 94 S.Ct. at 649.[18]

The leading Third Circuit case on this issue is *United States v. Tarnopol, supra.*

In *Tarnopol*, the defendants were officers in two corporations which were engaged in the production, marketing, and sale of records. They would order shipments of records to be made directly from the manufacturer to their customers. Each shipment was accompanied by a packing slip of which there were two copies. The manufacturer kept one copy and forwarded the second "confirmation copy" to the defendants' corporations. The defendants would intercept the packing slip thus preventing the transaction from being entered on the company's ledger and retain the proceeds of the sale for their own use. They were indicted and convicted on numerous counts of mail fraud. On appeal, the convictions were reversed. The Court determined that the mailing of the packing slip, although contemporaneous with and generally part of the fraudulent transaction, was unrelated to the actual execution of the scheme. Rather, the packing slips were utilized by the defendants "merely as a convenient but not essential tool in carrying out [their] object." *Id.* at 472. *See also: United States v. Brown, supra* at 665–66.[19]

In *United States v. Britzman*, 547 F.2d 380 (7th Cir. 1977), defendants were con-

**18.** The Supreme Court has also held that a mailing may be "for the purpose of executing" a scheme to defraud when it is intended to lull the victim into a false sense of security or in some way cause the victim to postpone reporting the fraud to the authorities. *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). *See also: United States v. Georgalis*, 631 F.2d 1199, 1204 (5th Cir. 1980). No contention was made that the mailings in the instant case served this purpose nor would the evidence support such an assertion.

**19.** Defendants argue that the evidence shows the mailings in the instant case to be routine, intrinsically innocent business mailings within the meaning of *United States v. Tarnopol, supra*, which could not be deemed instrumental in executing a scheme to defraud. However, even assuming *arguendo* that the mailings in this case were routine, intrinsically innocent business mailings, this would not in and of itself remove them from the scope of the mail fraud statute. In *United States v. Brown, supra*, the Court of Appeals rejected the contention that the language in *Tarnopol* had established a class of mailings automatically exempt from mail fraud prosecution:

We do not believe that *Tarnopol* created a *per se* exception for any mailing which can be regarded as a "routine business mailing." The case merely applied the already established notion that mailings which are too remote from a fraudulent scheme will not support a mail fraud charge. . . .

Thus, *Tarnopol* determined on the particular facts presented that the purpose of the mailings was not closely connected to the fraudulent scheme. The case did not hold that a "routine business mailing" which is closely bound with the scheme cannot support a mail fraud charge. Similarly, the cases relied upon by Senior Judge Maris did not create a *per se* defense for business mailings, but looked to whether a mailing was too remote from the fraud.

583 F.2d at 667. (citations omitted) *See also: United States v. Camiel*, 503 F.Supp. 769 (E.D. Pa.1980). Hence, the nature of the mailings is irrelevant to the disposition of this matter. The pertinent inquiry is whether the mailings were instrumental in the accomplishment of defendants' scheme.

victed of eight counts of mail fraud for their participation in a check-kiting scheme. The mailings upon which the mail fraud charges were based were five bank statements and three overdraft notices which were mailed to defendants. The Court of Appeals reversed the convictions holding that the mailings were merely records of the transactions involved and were in no way instrumental to the effectuation of the scheme. *Id.* at 384. Similarly, in *United States v. Alston*, 609 F.2d 531 (D.C.Cir.1979) cert. denied 445 U.S. 918, 100 S.Ct. 1281, 63 L.Ed.2d 603 (1980), defendant and an accomplice were involved in a scheme in which adverse information was deleted from and fictitious favorable information added to the computerized credit files of individuals who had difficulty in obtaining credit. The mailing which formed the basis of the mail fraud counts was the sending of an installment contract from the automobile dealer to the lender after credit had been obtained. In reversing the mail fraud conviction, the court held that the mailing of the installment contract occurred after the object of the scheme had been accomplished. Thus, the use of the mails was not related to the effectuation of the scheme. *Id.* at 539.

By contrast, in *United States v. Lea, supra*, the defendant was a purchasing agent in the meat department of Safeway. He became involved in a kickback scheme with two brokers of meat products. The mailings at issue were statements of account and checks which were mailed between the brokers and the sellers with whom they dealt. Despite the fact that defendant did not participate in any of the mailings, the Court held that they were instrumental in the accomplishment of the object of his fraudulent scheme and sustained the mail fraud conviction:

> Here, the items mailed, though probably not absolutely essential to success, furthered the scheme. To obtain funds to pay the kickbacks, Mutual had to secure commission payments from the suppliers who sold to Safeway. In the ordinary course of business, the confirmations and commission statements facilitated receipt of the commission checks, which after being deposited in Mutual's bank account, served as the source of funds for the payments to Lea.

*Id.* at 431. Finally, in *United States v. Rodgers*, 624 F.2d 1303 (5th Cir. 1980), defendants were involved in a complex bid-rigging scheme involving the allocation of river bank stabilization projects awarded by the Army Corps of Engineers. The mail fraud charges were premised upon notices to proceed and payment checks sent from the Corps of Engineers to the successful bidder. In language directly pertinent to the instant case, the court held that the mailings served to execute the fraudulent scheme:

> It is true that the scheme to defraud did not concern the performance of the contract work itself. Rather the scheme primarily involved the allocation of the contractors to perform that work. Nevertheless, the scheme defrauded the government of its right to depend upon the competitive process to allocate the jobs and to set the cost of those jobs. The scheme would have been meaningless, incomplete, and futile without final award and payment which were accomplished through the mail. Clearly, the mails were used "in furtherance" of the scheme.

*Id.* at 1310. (footnote omitted).

It remains to apply these principles to the present case. The defendants contend that the mailing of the promotional materials was related only to their goal of ultimately making money from the completed allegro system. It did not, they assert, further the unauthorized use of Univac's computer facilities and therefore was unrelated to the execution of the fraudulent scheme. In so arguing, defendants posit an unduly restrictive interpretation of the perimeters of their scheme to defraud. Under the terms of the indictment, Kelly and Palmer were charged with defrauding Univac by *using its resources for their own personal gain.* The evidence at trial clearly established that while the defendants were utilizing Univac's facilities to develop the technologi-

cal viability of the system, they were actively engaged in attempting to develop a market for the completed allegro program. Stephen P. Rauch, president of Big Bells, Inc., a musical publishing house, testified that in late 1974 or early 1975 he was contacted by Matthew Palmer who submitted a proposal that Big Bells undertake the financing of the allegro system. The proposal set forth both anticipated sales and anticipated net profits for the first two years of the system's operation (Tr. 7–61—7–63). When this proposal did not work out, defendants engaged in negotiations with Andrew Trolio which led to the June 5, 1975 joint venture agreement and eventually the incorporation of CAMPS, Inc. (Tr. 5–82—5–83). Between the date of the agreement and December of 1975, Kelly and Palmer continued to develop the system until, in Trolio's words "we decided that we would have a promotional." (Tr. 5–85). At that point, defendants caused the mailing of the materials which form the basis of the mail fraud indictment.

Thus, the utilization of Univac's computer facilities cannot be viewed in isolation. As the evidence makes abundantly clear, the primary, if not exclusive, motivating factor in defendants' unauthorized use of their employer's computer storage facility was their desire to market the completed allegro system at a substantial pecuniary gain for themselves. Hence, Kelly and Palmer's attempts to develop the technological capabilities of the system cannot be viewed as distinct from their attempts to sell it. Both activities were directed at the achievement of a single goal—to derive financial gain from the marketing of the completed allegro system. Indeed without this goal, the computer use was merely an academic exercise by the defendants not unlike the games of Star Trek and chess in which Univac's other employees occasionally engaged during off hours.

The obvious purpose of the promotional material was to solicit potential sales for the completed allegro system. Viewed on this context, the mailings were directly related to the achievement of the fruits of defendants' scheme. I therefore conclude

that the mailing in question was "for the purpose of executing" the scheme to defraud.

## V. CONCLUSION

For all of the foregoing reasons, the defendants' posttrial motions will be denied.