UNITED STATES of America

v.

**Biagio Robert PINTO, a/k/a Bob Pinto, George V. Keckeisen, Edward Pfeffer and John Buchanan.**

**Cr. No. 81–00057.**

United States District Court,
E. D. Pennsylvania.

Jan. 14, 1982.

238

Julian Greenspun, U. S. Dept. of Justice, Washington, D. C., for United States.

Carmen C. Nasuti, Jacob Kossman, Philadelphia, Pa., for Biagio Robert Pinto, a/k/a Bob Pinto.

Stanford Shmukler, Philadelphia, Pa., for George V. Keckeisen.

William J. Winning, Media, Pa., for Edward Pfeffer.

Thomas A. Bergstrom, Philadelphia, Pa., for John Buchanan.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

On February 26, 1981, the grand jury returned a twenty-one (21) count indictment charging the defendants, collectively, with mail fraud and Elkins Act offenses as well as conspiracy. 18 U.S.C. § 1341, 49 U.S.C. § 41(1); 18 U.S.C. § 371.[1] Essen-

---

1. 18 U.S.C. § 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

49 U.S.C. § 41(1) provides:

(1) Anything done or omitted to be done by a corporation common carrier, subject to the Act to regulate commerce and the Acts amendatory thereof, which, if done or omitted to be done by any director or officer thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by such corporation, would constitute a misdemeanor under said Acts or under sections 41,

tially, the defendants allegedly combined in a single conspiracy whereby the defendants Keckeisen, Pfeffer and Buchanan abused their employment positions with American Airlines for personal profit by affording preferential contract or bargaining status to a business controlled by the defendant Pinto. Pinto Trucking Service [hereinafter "PTS"] was a common carrier engaged in the business of transporting merchandise and freight by motor vehicle which received several regional contracts from American Airlines to perform trucking services. The case was tried to the Court without a jury and at its conclusion counsel were directed to submit proposed findings of fact and

conclusions of law. On December 29, 1981, a narrative of undisputed facts was filed, see Docket Entry No. 86, pp. 1–12, which additionally contained a list identifying a number of unresolved factual issues. The Court will render findings of fact as it perceives them, relying principally upon counsels' submission of undisputed facts. The disputed factual issues will be resolved therein.

### Findings of Fact [2]

1. At all times material herein, American Airlines provided air freight transportation services which were actively conducted by separate freight departments located at various airport terminals. Managers of

42, or 43 of this title, shall also be held to be a misdemeanor committed by such corporation, and upon conviction thereof it shall be subject to like penalties as are prescribed in said Acts or by sections 41, 42, or 43 of this title, with reference to such persons, except as such penalties are herein changed. The willful failure upon the part of any carrier subject to said Acts to file and publish the tariffs or rates and charges as required by said Acts, or strictly to observe such tariffs until changed according to law, shall be a misdemeanor, and upon conviction thereof the corporation offending shall be subject to a fine of not less than $1,000 nor more than $20,000 for each offense; and it shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said Act to regulate commerce and the Acts amendatory thereof whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said Act to regulate commerce and the Acts amendatory thereof, or whereby any other advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than $1,000 nor more than $20,000: Provided, That any person, or any officer or director of any corporation subject to the provisions of sections 41, 42, or 43 of this title, or the Act to regulate commerce and the Acts amendatory thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by any such corporation, who shall be convicted

as aforesaid shall, in addition to the fine herein provided for, be liable to imprisonment in the penitentiary for a term of not exceeding two years, or both such fine and imprisonment, in the discretion of the court. Every violation of this section shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed, or through which the transportation may have been conducted; and whenever the offense is begun in one jurisdiction and completed in another it may be dealt with, inquired of, tried, determined, and punished in either jurisdiction in the same manner as if the offense had been actually and wholly committed therein.

(a) A person that knowingly offers, grants, gives, solicits, accepts, or receives by any means transportation or service provided for property by a common carrier subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title (1) at less than the rate in effect under chapter 107 of this title, or (2) by practicing discrimination, shall be fined at least $1,000 but not more than $20,000, imprisoned for not more than 2 years, or both.

18 U.S.C. § 371 provides, in part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. The Court will provide references to the record in support of its findings with respect to disputed facts. When undisputed facts are found and recorded, there will be no reference to the record. Instead, see Docket Entry No. 86.

freight sales and services conducted the business of the local operations but were administratively overseen by the Vice President for Freight Marketing.

2. Services performed by the local departments which are material to the prosecution of this case are what is known in the industry as "HUB" trucking and the processing of international freight through customs. The concept of "HUB" trucking entailed the utilization of trucking companies to transport freight from one local American Airlines' facility to another. Processing international freight through customs involved the unloading and storage of freight, the confirmation and preparation of bills of lading, airway bills, interline agreements and invoices and the clearing of freight through customs. The term "inbound—in bond" is frequently used in conjunction with this latter freight service and refers to the bonding requirements for handling freight entering the United States from abroad.

3. As earlier mentioned, "HUB" trucking services were usually performed by independent carriers which had been retained by American Airlines. Decisions concerning the procurement, retention and discharge of local "HUB" truckers were generally reached in accordance with an American Airlines' policy whereby both field and staff personnel were utilized. Essentially, the local freight sales and services managers would undertake a determination whether a "HUB" trucker was needed and, depending upon that determination, would make a recommendation of a particular carrier to satisfy the perceived need. This recommendation was to be based upon several factors including tariff rates, quality of service and availability of equipment. The local managers' recommendation would be forwarded to the Director of Freight Marketing and, ultimately, to the Vice President for Freight Marketing for approval. Although the local managers were empowered to merely recommend a particular carrier, their recommendations were usually adopted primarily because of the deference afforded their perceived familiarity and expertise with local situations. See Notes of Testimony, pp. 3.16, 4.51, 5.21.

4. As will be further developed, PTS was an independent carrier utilized by American Airlines to perform "HUB" trucking services. PTS was effectively owned and controlled by the defendant Pinto and was located at 1414 Calcon Hook Road, Sharon Hill, Pennsylvania.

5. The defendant George Keckeisen was employed by American Airlines in various capacities from at least, for purposes of this case, 1971 and until April of 1978. In 1971, he replaced the defendant Edward Pfeffer as Manager of Freight Sales and Services in Philadelphia and remained in that position until August of 1976. At that time, he was transferred to New York to manage freight sales and services at the JFK airport terminal.

6. The defendant Edward Pfeffer was employed by American Airlines in various capacities from at least, for purposes of this case, 1966 and until April of 1978. In 1966, he began serving as Manager of Freight Sales and Services in Philadelphia and continued that function until sometime in 1971 when he was promoted to an administrative position requiring service in New York. His title in New York was that of Director of Freight Forwarding Sales. Subsequently, in September of 1974, he was transferred to O'Hare Airport in Chicago to serve as Manager of Freight Sales and Services.

7. The defendant John Buchanan was employed by American Airlines in various capacities from at least, for purposes of this case, 1966 and until April of 1978. From at least 1966 until August of 1976, he served in Philadelphia as Supervisor of Freight Services under the management of both the defendants Pfeffer and Keckeisen. In August of 1976, he was promoted to the position of Manager of Freight Sales and Services in Philadelphia, replacing the defendant Keckeisen.

8. Until their employment was terminated, each of the defendants Keckeisen, Pfeffer and Buchanan received job promotions or promotional transfers at various times of their respective careers. Their job

performances, respectively, were generally viewed favorably by American Airlines' personnel.

9. The evidence, developed of record, both directly and inferentially establishes that the defendant Pinto, in order to further the business interests of PTS, extended bribes, kickbacks and gratuities to the defendants Keckeisen, Pfeffer and Buchanan who in turn afforded the defendant Pinto a preferred and exceptional status with respect to the eventual award of American Airlines' "HUB" trucking routes and the provision of certain services. The defendants Keckeisen, Pfeffer and Buchanan's intentional receipt of bribes, kickbacks and gratuities resulted in the preferred and exceptional selection, retention and increase of PTS contractual relationships with American Airlines in a manner significantly corresponding to the promotions and transfers of the American Airlines' defendants.[3] *See* Finding of Fact No. 3.

10. During the entire period of the alleged conspiracy from 1966 until January of 1978, the defendant Keckeisen directly and indirectly, through conduits, received money payments in the form of business checks upon the instance of the defendant Pinto. Additionally, in 1974, the defendant Keckeisen accepted and received a 1973 Mercury Station Wagon from the defendant Pinto. The defendant Keckeisen accepted these gratuitous payments and merchandise and negotiated or utilized them for his personal benefit in conscious violation of an American Airlines' conflict of interest policy.[4]

*See also* Government Exhibit Nos. 857–857(b), 858–858(a).

11. During the entire period of the alleged conspiracy from 1966 until January of 1978, the defendant Pfeffer directly and indirectly, through conduits, received money payments in the form of business checks upon the instance of the defendant Pinto. The defendant Pfeffer accepted these gratuitous payments and negotiated them for his personal benefit in conscious violation of an American Airlines' conflict of interest policy.[5] *See also* Government Exhibit Nos. 856–856(g).

12. During the entire period of the alleged conspiracy from 1966 until January of 1978, the defendant Buchanan directly and indirectly, through conduits, received money payments in the form of business checks upon the instance of the defendant Pinto. The defendant Buchanan accepted these gratuitous payments and negotiated them for his personal benefit in conscious violation of an American Airlines' conflict of interest policy.[6] *See also* Government Exhibit Nos. 855–855(h).

13. Information of the defendants Keckeisen, Pfeffer and Buchanan's financial relationship with the defendant Pinto was material to the conduct of business by and best interests of American Airlines inasmuch as "HUB" trucking was a viable aspect of American Airlines' business and the defendants Keckeisen, Pfeffer and Buchanan's recommendation of "HUB" trucking carriers was integral to its conduct.

---

**3.** Citations to the record in support of this finding is not immediately supplied but will be included in subsequent findings elaborating upon this point. In addition, the Court notes that its finding that all of the defendants intentionally engaged in a *reciprocal exchange of favors* does not imply that a single conspiracy rather than multiple conspiracies existed. This important aspect of the case will be addressed separately. *See* Findings of Fact Nos. 31–34.

**4.** *See* Finding of Fact No. 15 for a brief discussion of American Airlines' conflict of interest policy.

**5.** *See* note 4 *supra.*

**6.** *See* note 4 *supra.* The Court notes that one of the factual issues in dispute contained in Docket Entry No. 86 concerns whether the defendant Buchanan received cash from the defendant Pinto. The inclusion of this issue as one in dispute appears to be inconsistent with the itemization in the same document of those factual issues the resolution of which is not in dispute. Perhaps this apparent inconsistency may be explained as a matter of semantics; that is, cash versus checks. Notwithstanding, the Court specifically finds that the defendant Buchanan did receive, directly or indirectly, gratuitous payments from the defendant Pinto, both in the form of business checks as well as cash. *See* Notes of Testimony, pp. 1.69–.73.

14. The business checks specifically identified in Counts 1–4, 6–12 and 14–21, inclusive, of the indictment were admittedly among the aforementioned business checks utilized by the defendant Pinto to accomplish money payments to the defendants Keckeisen, Pfeffer and Buchanan. Additionally, the aforementioned business checks were intentionally distributed to the defendants Keckeisen, Pfeffer and Buchanan through the use of the mail system.

15. The aforementioned American Airlines' conflict of interest policy essentially prohibited its employees or members of their immediate families from receiving money or gifts from suppliers of goods or services. There is no direct evidence that the defendant Pinto knew of this policy.

16. PTS exclusively operated the Philadelphia "HUB" trucking routes at least as early as 1966, see Notes of Testimony, pp. 3.145–.146, 4.66, 4.78, and continued this function until sometime in 1981. See Notes of Testimony, p. 5.78.

17. During the tenure of PTS's exclusive operation of "HUB" trucking in Philadelphia, each of the defendants Keckeisen, Pfeffer and Buchanan served as Manager of Freight Sales and Services. As earlier found, see Findings of Fact Nos. 5–7, the defendant Pfeffer served in this capacity from 1966 until sometime in 1971, the defendant Keckeisen from sometime in 1971 until August of 1976 and the defendant Buchanan from August of 1976 until his termination in April of 1978. In addition, the defendant Buchanan served as Supervisor of Freight Services under the direction of both defendants Pfeffer and Keckeisen from 1966 until August of 1976. See Finding of Fact No. 7.

18. As a consequence of the defendants Pfeffer, Keckeisen and Buchanan's collective [7] extension of a preferred and exceptional status to the defendant Pinto and PTS over the period from 1966 until April of 1978, American Airlines was deprived of the opportunity to search for or gain access to a carrier providing a higher quality of service or a lower price.[8] While PTS was the sole "HUB" trucker physically located in Philadelphia which was equipped to service American Airlines' local operation, see Notes of Testimony, pp. 3.128, 8.64, there existed carriers located outside Philadelphia which were equipped to service American Airlines although there is some uncertainty with respect to their route authority. See Notes of Testimony, pp. 3.139–.140, 8.71. In this latter regard, there is no requirement that a carrier be located in an area of service as evidenced by the ability of PTS to perform services for American Airlines in Chicago and Dallas. See Notes of Testimony, pp. 4.34 and 3.140.

19. On December 3, 1974, PTS was awarded the Chicago-Indianapolis "HUB" trucking route servicing American Airlines. See Government Exhibit No. 808(b). See also Notes of Testimony, p. 3.81.

20. At the time PTS was initially awarded the lucrative Chicago-Indianapolis "HUB" trucking route, the defendant Pfeffer was Manager of Freight Sales and Services at O'Hare Airport and had functioned in that capacity only since September of 1974. The defendant Pfeffer had in fact recommended PTS over the existing carrier, Commercial Motor Freight Company [hereinafter "Commercial"], on November 18, 1974 based upon his stated perception that PTS could provide a better service at a lesser rate. See Government Exhibit No. 808(a); Notes of Testimony, p. 3.17. The defendant Pfeffer stated in his November 18, 1974 memo to the Indianapolis general manager that PTS would charge a flat rate per pallet rather than the exclusive-use, trip charge made by Commercial which would result in savings to American Airlines in excess of $3,000.00 per month. Additional-

---

7. The Court's use of the word "collective" does not imply a finding of a conspiracy but rather merely refers to the different tenures of the American Airlines' defendants while serving as Manager of Freight Sales and Services in Philadelphia. But see Findings of Fact Nos. 31–34.

8. This is not intended to suggest that the service offered by PTS was inferior or its prices excessive. See Findings of Fact No. 29.

ly, the defendant Pfeffer noted the superiority of equipment provided by PTS. Although not mentioned in the defendant Pfeffer's memo, PTS had also agreed to paint the American Airlines logo on its trucks, unlike Commercial. *See* Notes of Testimony, p. 4.21.

21. Based upon the statements made in the defendant Pfeffer's aforementioned recommendation, it appears as though PTS made a more attractive offer to American Airlines to service the Chicago-Indianapolis "HUB" trucking route than that extended by Commercial. PTS, however, failed to comply with the terms of its offer once awarded the route. *See* Notes of Testimony, pp. 6.20–.21. PTS almost immediately began charging American Airlines an exclusive truck rate while continuing to carry freight for other customers as well as charging American Airlines for round-trip carriage when only one-way services were provided. *See* Government Exhibit Nos. 811(c), (e), (g), (i), 833(b); Notes of Testimony, pp. 3.92, 4.37–.38. As a consequence, PTS's actual charges for similar services were 12% higher than those charged earlier by Commercial. *See* Notes of Testimony, p. 6.20–.21. In this regard, Commercial was adequately, if not equally, equipped and qualified as PTS to continue the operation of servicing the Chicago-Indianapolis "HUB" trucking route. *See* Notes of Testimony, pp. 4.18–.19. PTS provided an additional charge to American Airlines for painting the latter's logo on its trucks. *See* Notes of Testimony, pp. 4.27–.28.

22. In 1976, the defendant Keckeisen recommended to American Airlines' administrative offices that PTS be given a proposed "HUB" trucking route between Boston, New York and Philadelphia. No decision with respect to this and other recommendations forthcame from the administrative offices inasmuch as the purpose underlying the need for a single "HUB" trucking route was eliminated. *See* Notes of Testimony, p. 5.16.

23. In May of 1976, the American Airlines' freight department in Philadelphia began processing international freight through customs for PTS.

24. At the time American Airlines commenced supplying this service to PTS, the defendant Keckeisen served as Manager of Freight Sales and Services and the defendant Buchanan acted as his Supervisor of Freight Services. As earlier found, in August of 1976, the defendant Buchanan was promoted to the manager position, replacing the defendant Keckeisen who had been transferred to New York. *See* Notes of Testimony, p. 4.100.

25. The utilization by PTS of American Airlines' Philadelphia freight department for the processing of international freight was primarily related to its carriage of "inbound—in bond" materials. In this regard, the processing of PTS's "inbound—in bond" freight involved additional effort and services than that usually extended or provided other customers of American Airlines. *See* Notes of Testimony, pp. 3.149, 3.167–.170. In addition, it appears that PTS received these services at a rate substantially less than that charged other customers of American Airlines. The normal rate varied between 1½ cents to 2 cents per pound with a minimum charge of $300.00 per month while PTS was merely charged 1 cent per pound during May of 1976 and ¼ cent per pound thereafter. *Compare* Notes of Testimony, p. 4.94 *with* Government Exhibit Nos. 790(a)–(r).

26. The defendants Pinto, Keckeisen and Buchanan contend that the provision of a lower rate to PTS is attributable to the prior inefficient use of American Airlines' employees and thereby resulted in the more effective use of what is known in the industry as "down time" and that if the lower rate had not been afforded PTS it would not have utilized the service. The record developed in this case, however, reflects that American Airlines eventually was required to employ more persons to perform the services utilized by PTS and others. *See* Notes of Testimony, pp. 4.127, 4.134–.135. Additionally, it would appear more prudent to utilize "down time" employees in a manner more effectively increasing revenue than at the comparatively

nominal rate charged PTS. Finally, the failure of the defendants Keckeisen and Buchanan to procure the required contract approval of the administrative offices of American Airlines and the unusual procedures involved in the mailing of invoices casts dispersions on the entire arrangement. *See* Notes of Testimony, pp. 4.109, 4.156–.157 and 4.107, 4.158.

27. The defendant Keckeisen administered—prior to its mailing—the processing of the invoice dated July 15, 1976 by providing the necessary factual information for its preparation. *See* Notes of Testimony, p. 5.106; Government Exhibit No. 790(b). The defendant Buchanan administered—prior to its mailing—the processing of the invoice dated August 23, 1976 by providing the necessary factual information for its preparation. *See* Notes of Testimony, pp. 4.103, 5.106; Government Exhibit No. 790(c).[9]

28. In the Fall of 1977, American Airlines was in the process of deciding which carrier to select for the operation of its New York-Syracuse "HUB" trucking route. During the course of the decision-making process a controversy arose between the respective managers of New York and Syracuse concerning which of two carriers was appropriate to service their route. The New York manager, the defendant Keckeisen, recommended PTS while the Syracuse manager recommended Herlihy Trucking Company [hereinafter "Herlihy"]. *See* Notes of Testimony, pp. 5.23–.24. The defendant Keckeisen based his recommendation on his opinion that Herlihy provided unreliable service in a couple of instances and that PTS charged a lower rate. *See* Government Exhibit No. 761. Upon the completion of an American Airlines' investigation, it was discovered that the defendant Keckeisen was in error both with respect to his complaints about the reliability of Herlihy's service and the cost differential he said favored PTS. *See* Notes of Testimony, pp. 5.28, 5.33 and 5.33. As respects cost of service, it was learned that PTS on at least one occasion charged American Airlines the round-trip rate when only one-way service was provided. *See* Notes of Testimony, pp. 5.29, 5.37. The defendant Keckeisen never acknowledged his error despite advice to the contrary but rather continued his recommendation of PTS. *See* Notes of Testimony, pp. 5.35, 5.37. Ultimately, Herlihy was selected to service the route. *See* Notes of Testimony, p. 5.23.

29. From at least 1966 until sometime in 1981, American Airlines was satisfied with the quality of service provided and the tariff rates filed by PTS. In fact, American Airlines continued to utilize the carriage service of PTS for approximately three years subsequent to the termination from employment of the defendants Keckeisen, Pfeffer and Buchanan.

30. During the defendant Pfeffer's tenure as Director of Freight Forwarding Sales, he was empowered to recommend the creation of "HUB" trucking routes as well as carriers but had no authority to ultimately approve or disapprove. *Compare* Notes of Testimony p. 4.52 *with* pp. 4.64–.65. The defendant Pfeffer's power to recommend extended only so far as his familiarity with local operations and apparently was not unlike the power afforded local managers of freight sales and services. *See* Notes of Testimony, p. 4.52.

31. The provision of monetary payments and gifts by the defendant Pinto to each of the defendants Keckeisen, Pfeffer and Buchanan and the reciprocal provision of business-related favors by each to the defendant Pinto irrefutably establishes the existence of an agreement between the defendant Pinto and each of the defendants Keckeisen, Pfeffer and Buchanan. *See* Notes of Testimony, pp. 3.68–.69, 3.74–.75.

32. On several occasions, the defendants Keckeisen and Buchanan met at the defendant Pinto's business office. *See* Notes of Testimony, pp. 1.64–.67, 1.76. Moreover, the defendants Keckeisen and Buchanan jointly contributed to the provision of international freight services to the defendant Pinto. *See* Notes of Testimony, p. 4.112.

**9.** *See* Counts 5 and 13 of the Indictment, respectively.

33. In November of 1972, two anonymous letters were received at the American Airlines' office located in Philadelphia. One of the letters was addressed to the defendant Keckeisen and alleged that the defendant Buchanan's wife was receiving payments from PTS. The defendant Keckeisen conducted an initial but inconsequential inquiry and failed to further investigate. *See* Government Exhibit No. 790(b).

34. The defendant Pfeffer was acquainted with the defendants Keckeisen and Buchanan through various and timely work relationships and transitions and from limited social contacts. *See* Notes of Testimony, pp. 3.86–.88, 4.47, 4.88–.90. *But compare* Notes of Testimony, pp. 4.47–.48 *with e.g.* Notes of Testimony, p. 4.112. The defendant Pfeffer did not participate in the provision of international freight services to PTS. *See* Notes of Testimony, p. 4.132.

### Conclusions of Law

*Mail Fraud*

■ 1. The elements essential to establish a violation of the mail fraud statute, 18 U.S.C. § 1341, are a scheme or artifice to defraud and the use of the United States mails in execution of the scheme. *See, e.g., Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *United States v. Kaplan,* 554 F.2d 958 (9th Cir. 1977).

■ 2. In order to establish a particular defendant's culpability for a mail fraud offense, the government has the burden of demonstrating beyond a "reasonable doubt that the defendant not only knowingly performed acts which the law forbids, but that he did the acts with the intent to violate the law." *United States v. Bryza,* 522 F.2d 414, 421 (7th Cir. 1975). As a consequence, there must be a recognizable scheme formed with the specific intent to defraud. *See, e.g., United States v. Bohonus,* 628 F.2d 1167, 1172 (9th Cir. 1980). "The critical element is fraudulent intent." *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1180 (2nd Cir. 1970).

■ 3. The Government may satisfy the requirement that it demonstrate a specific intent to defraud attributable to a particular defendant by offering evidence of instances when the particular defendant took actions preventing the discovery of his misdeeds or, for purposes of the instant case, his breach of a fiduciary duty. *See United States v. Bryza, supra* at 422. The acts of forming artificial companies, creating or identifying conduits for receiving payments and failing to disclose economic interests constitute actions capable of manifesting specific intent. *See, e.g., United States v. Bush,* 522 F.2d 641, 649 (7th Cir. 1975); *United States v. Bryza, supra* at 422.

■ 4. The object of a fraudulent scheme need not be the deprivation of a tangible interest but instead may relate to an intangible property. *See, e.g., United States v. Barta,* 635 F.2d 999, 1006 (2d Cir. 1980); *United States v. Bohonus, supra* at 1172; *United States v. Kelly,* 507 F.Supp. 495, 501 (E.D.Pa.1981).

■ 5. A scheme which is directed at depriving an employer of the honest and faithful services of its employees or of its "right to have its business conducted honestly may constitute a 'scheme to defraud' within the meaning of the mail fraud statute." *United States v. Kelly, supra* at 499. *See also United States v. Bohonus, supra* at 1172. However, the breach of an employee's fiduciary duty, without more, does not constitute such a violation. *See, e.g., United States v. Mandel,* 591 F.2d 1347, 1362 (4th Cir. 1979); *United States v. McDonald,* 576 F.2d 1350, 1359 n.14 (9th Cir. 1978). "The additional element which frequently transforms a mere fiduciary breach into a criminal offense is a violation of the employee's duty to disclose material information to his employer." *United States v. Barta, supra* at 1006. *See also United States v. Kelly, supra.*

■ 6. The additional element of failure to disclose material information to an employer may be established by evidence of misrepresentations in company conflict of interest statement, withholding of informa-

tion concerning interest in private enterprises which are being recommended to engage in contractual services, withholding of information concerning business advantages being afforded particular private enterprises and misrepresentations in recommendations utilized for the purpose of selecting private enterprises to perform contractual services. *See, e.g., United States v. Bush,* 522 F.2d 641, 647 (7th Cir. 1975); *United States v. Bryza, supra; United States v. Kelly, supra.* Accordingly, the material information withheld or misrepresented must be related to the conduct of the employer's business. *See, e.g., United States v. Rabbitt,* 583 F.2d 1014, 1024–25 (8th Cir. 1978).

7. Of course, if the object of a fraudulent scheme relates to the deprivation of a tangible property, a mail fraud offense may be found. Tangible property may be deprived when a service is provided a particular enterprise at a cost substantially less than that charged other various customers, when a private enterprise which is contracted to perform services does so at a cost higher than that actually charged by a competitor or when, as a result of recommendations, an employer is deprived of an opportunity to obtain better terms in a contract. *See United States v. Bush, supra* at 647–48.

8. In order to constitute a mail fraud offense there is no requirement that the victims of the crime ultimately suffer economic loss or damage. *See, e.g., United States v. Bush, supra* at 648; *United States v. Reicin,* 497 F.2d 563 (7th Cir. 1974). Nor is there a need for a victim to take retributive actions. *See United States v. Bryza, supra* at 422.

9. "The mailing element [necessary to establish a mail fraud offense] ... consists of two requirements: (1) that the defendant caused the use of the mails and (2) that this use was 'for the purpose of executing' the deceptive scheme." *United States v. Pereira, supra* 347 U.S. at 8–9, 74 S.Ct. at 362–363.

10. See note 1 *supra* for the full text of 49 U.S.C. § 41(1). It may be noted that this statute was recodified, effective October 17, 1978,

10. The defendants Pinto, Keckeisen, Pfeffer and Buchanan engaged in a scheme to defraud American Airlines and used the mails in the furtherance of that scheme. Moreover, the aforenamed defendants had a specific intent to engage in the fraud, all in violation of 18 U.S.C. § 1341.

*Elkins Act*

11. 49 U.S.C. § 41(1) provides, in pertinent part, that "it shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate ... commerce by any common carrier ... whereby any such *property shall ... be transported at a less rate than that named in the tariffs published and filed by such carrier, ...* or whereby any other advantage is given or discrimination is practiced." (Emphasis added).[10]

12. The intended purpose of this statute is "to prevent any kind of departure from the published rates and to that end [Congress] outlawed all rebates, without requiring a showing of benefit to any shipper." *United States v. Braverman,* 373 U.S. 405, 406, 83 S.Ct. 1370, 1371, 10 L.Ed.2d 444 (1963). *See Baltimore and Ohio Chicago Terminal Railroad Company v. United States,* 583 F.2d 678, 690–91 (3d Cir. 1978).

13. The government has failed to develop of record evidence beyond a reasonable doubt that there was a deviation from the tariff rates published and filed by PTS.

*Conspiracy*

14. Count I of the indictment charges that the defendants Pinto, Keckeisen, Pfeffer and Buchanan "did willfully and knowingly *conspire, confederate, combine and agree amongst themselves* and with others ... to commit offenses against the United States in violation of Title 18, United States Code § 371 ...." (Emphasis added). The

without substantive effect. 49 U.S.C. § 11903(a).

charge is that of a single, continuing conspiracy.

15. The primary element essential to establish the existence of a conspiracy is agreement.[11] "It is a partnership in criminal purpose. The gist of the crime is the confederation or combination of minds." *Marino v. United States,* 91 F.2d 691, 694 (9th Cir. 1937). "The formalities of an agreement [, however,] are not necessary . . . ." *United States v. Varelli,* 407 F.2d 735, 741 (7th Cir. 1969).

16. The existence of a conspiracy may be established by resort to or reliance upon circumstantial evidence. *See, e.g., United States v. Trotter,* 529 F.2d 806, 810 n.4 (3d Cir. 1976). A common purpose and plan may be inferred from a "development and collocation of circumstances." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

17. In the present case, the common purpose of the conspiracy, particularly as charged in the indictment, was for PTS to procure and maintain American Airlines' freight business. The common purpose was not limited to the procurement and/or retention of particular American Airlines' "HUB" trucking routes or freight services. The defendants Pinto, Keckeisen, Pfeffer and Buchanan were members of the conspiracy and participated in the achievement of its objective. *See, e.g., Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Boyd,* 595 F.2d 120 (3d Cir. 1978) (conviction reversed on other grounds).

18. In order to establish the participation of a particular defendant in a conspiracy, the government "must demonstrate that the defendant agreed with others to join the conspiracy and participate in the achievement of the illegal objective." *United States v. Grassi,* 616 F.2d 1295, 1301 (5th Cir. 1980). More than mere knowledge of a conspiracy and an association with its participants is required, *see, e.g., United*

States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), although evidence of this nature combined with other circumstantial evidence may prove joinder. *United States v. Etley,* 574 F.2d 850 (5th Cir. 1978).

19. Evidence of knowledge of a conspiracy in addition to actions taken in furtherance of it may imply a particular defendant's participation. *United States v. Provenzano,* 620 F.2d 985, 999 (3d Cir. 1980). Acts of receiving monetary payments in return for preferential treatment in contract relationships coupled with the continuation and expansion of such relationships despite geographical and promotional transfers constitute this type of evidence. These acts reflect and represent the receipt of profits or proceeds as well as the suggestion that the plan or purpose is not limited to the particular transactions. *See United States v. Schoenhut,* 576 F.2d 1010, 1028 (3d Cir. 1978) and *Blumenthal v. United States, supra* 332 U.S. at 558, 68 S.Ct. at 257.

20. Evidence of meetings with co-conspirators and the resort to subterfuge for the receipt of monetary payments may also circumstantially establish or imply a particular defendant's participation in a conspiracy. *See, e.g., United States v. Calabro,* 449 F.2d 885, 889–90 (2d Cir. 1971) and *United States v. Cahalane, supra* at 605. "Such acts, though some might be innocent in themselves, when viewed as a whole tie the defendant inextricably to the conspiracy." *United States v. Schoenhut, supra* at 1027.

21. "[O]ne can be a party to a conspiracy even though he does not know of the existence or identity of all his co-conspirators, and even though he does not participate in *all* of their acts." *United States v. Friedman,* 445 F.2d 1076, 1080 (9th Cir. 1971). (Emphasis added). Nor must a particular defendant know all of the details of a conspiracy, just the essentials. *See United States v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir. 1980).

11. Of course, the agreement must have an illegal purpose. *See United States v. Cahalane,* 560 F.2d 601, 604 (3d Cir. 1977); *United States v. Klein,* 515 F.2d 751 (3d Cir. 1975). In the present case, the illegal purpose has been earlier established and identified. *See* Conclusions of Law Nos. 1–10.

22. "[T]he government, without committing a variance between a single conspiracy charged in an indictment and its proof at trial, may establish the existence of a continuing core conspiracy which attracts different members at different times and which involves different sub-groups committing acts in furtherance of the overall plan." *United States v. Boyd, supra* at 123. *See also United States v. Kenny,* 462 F.2d 1205, 1216 (3d Cir. 1972).

### Verdicts

The Court notes that its Conclusions of Law with respect to Count 1, charging conspiracy, are equally applicable to Counts 2–13, inclusive, charging mail fraud, insofar as they pertain to identifying the collective guilt of the defendants. "[A] multidefendant mail fraud scheme can be analyzed like a conspiracy." *United States v. Camiel,* 519 F.Supp. 1238, 1241 n.7 (D.C. Pa.1981), *citing, e.g. United States v. Cohen,* 516 F.2d 1358, 1364 (8th Cir. 1975). The Court finds the defendants Pinto, Keckeisen, Pfeffer and Buchanan guilty of each of Counts 1 through 13, inclusive, but finds them not guilty of Counts 14 through 21, inclusive.

An appropriate Order will be entered.